IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

JAMIE LYNN VENABLE,       )
      Plaintiff,          )
                           )
         v.             )      Civil No. 3:18cv458 (DJN)
                           )
NANCY A. BERRYHILL,       )
Acting Commissioner of Social Security,   )
      Defendant.        )
_____)

## MEMORANDUM OPINION

On September 14, 2014, Jamie Lynn Venable ("Plaintiff") protectively applied for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the

Social Security Act ("Act"), alleging disability from depression, a hand/wrist problem, an ankle

problem and sarcoidosis, with an alleged onset date of June 28, 2014. The Social Security

Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration.

Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision

and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as

the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by: (1) failing to consider whether the combination of Plaintiff's

systemic lupus erythematosus ("SLE") and sarcoidosis met or medically equaled Listing 14.02;

(2) finding that Plaintiff's statements concerning the intensity persistence and limiting effects of

her symptoms proved inconsistent with the evidence of record; (3) affording improper weight to

the opinions of Sumeja Zahirovic, M.D., and the state agency medical and psychological

consultants; and, (4) relying on an incomplete hypothetical at step five. (Pl.'s Mem. of L. in Supp. of Soc. Sec. Appeal ("Pl.'s Mem.") (ECF No. 15) at 12-22.) This matter now comes before the Court by consent of the parties pursuant to 28 U.S.C. § 636(c)(1) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1] For the reasons set forth below, the Court hereby GRANTS Plaintiff's Motion for Summary Judgment (ECF No. 13), DENIES Defendant's Motion for Summary Judgment (ECF No. 20) and VACATES and REMANDS the final decision of the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings.

## I.  PROCEDURAL HISTORY

On September 14, 2014, Plaintiff filed an application for DIB and SSI with an alleged onset date of June 28, 2014. (R. at 225-32.) The SSA denied these claims initially on April 28, 2015, and again upon reconsideration on October 5, 2015. (R. at 99-100, 135-36.) At Plaintiff's written request, the ALJ held a hearing on May 12, 2017. (R. at 34-67.) On October 30, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 19-28.) On May 2, 2018, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-3.)

## II.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

---

[1]  The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations). In considering the decision of the Commissioner based on the record as a whole, the court must "tak[e] into account . . . 'whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the

ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At any step, if the ALJ finds the claimant disabled or not disabled, the ALJ makes his determination or decision and thus does not go on to the next step. §§ 404.1520(a)(4), 416.920(a)(4).

### III.   THE ALJ'S DECISION

On May 12, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 36-67.) On October 30, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 19-28.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 20-21.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 28, 2014, her alleged onset date. (R. at 21.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: SLE,[2] sarcoidosis,[3] depressive disorder, attention deficit disorder ("ADD") and anxiety disorder. (R. at 21.) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 21-22.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work with additional limitations. (R. at 23-24.) Specifically, the ALJ limited Plaintiff to standing or walking for up to four hours during an eight-hour workday. (R. at 23.) The ALJ found that Plaintiff could frequently operate hand controls and handle objects with her right upper extremity, and she could push, pull, lift and carry with the left upper extremity and bilateral lower extremities. (R. at 23-24.) The ALJ further concluded that Plaintiff could occasionally climb ramps, stairs and ladders and could occasionally stoop, kneel, crouch and crawl. (R. at 24.) As to Plaintiff's mental abilities, the ALJ estimated that Plaintiff could concentrate and focus for two hours before requiring a fifteen-minute break and could maintain attendance and

---

[2]    SLE denotes a chronic, inflammatory, often feverish multisystemic disorder that proceeds through remissions and relapses and affects the skin, joints, kidneys and serosal membranes of a patient. Although its exact cause is unknown, the disorder likely involves failure of the mechanisms regulating the autoimmune system. This condition primarily affects women aged twenty to forty years old. *Systemic Lupus Erythematosus*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[3]    Patients with sarcoidosis experience the chronic and progressive growths of hard tubercles, or nodules, on their organs and tissues, including the skin, lungs, lymph nodes, liver, spleen, eyes and small bones in the hands and feet. *Sarcoidosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

punctuality, though Plaintiff would experience one attendance problem per month and could not perform work at a production-rate pace. (R. at 24.) Plaintiff also required the option to sit or stand while working. (R. at 24.)

At step four, the ALJ determined that Plaintiff could not perform her past relevant work as a store manager. (R. at 26.) However, at step five, the ALJ concluded that Plaintiff's age, education, work experience and RFC allowed her to perform sedentary occupations, such as surveillance monitor and telephone information clerk. (R. at 26-27.) Therefore, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 28.)

## IV. ANALYSIS

Plaintiff, thirty-nine years old at the time of this Memorandum Opinion, previously worked as a store manager and cashier. (R. at 26, 83, 244.) She applied for Social Security benefits, alleging disability from depression, a hand/wrist problem, an ankle problem and sarcoidosis, with an alleged onset date of June 28, 2014. (R. at 24, 71, 101, 125.) Plaintiff's appeal to this Court alleges that the ALJ erred by: (1) failing to consider whether the combination of Plaintiff's SLE and sarcoidosis met or medically equaled Listing 14.02; (2) finding that Plaintiff's statements concerning the intensity persistence and limiting effects of her symptoms proved inconsistent with the evidence of record; (3) affording improper weight to the opinions of Dr. Zahirovic and the state agency medical and psychological consultants; and, (4) relying on an incomplete hypothetical at step five. (Pl.'s Mem. at 12-22.) For the reasons set forth below, the ALJ erred in her decision.

## A. The ALJ Properly Explained Why Plaintiff's Impairments, Both Singly and in Combination, Failed to Meet or Medically Equal Listing 14.02, and Substantial Evidence Supports the ALJ's Findings.

Plaintiff first challenges the ALJ's step-three determination that Plaintiff's physical impairments did not meet or medically equal the severity of the listed impairments in Listing 14.02. (Pl.'s Mem. at 13.) Specifically, Plaintiff contends that the ALJ failed to consider whether the impairments caused by the combination of Plaintiff's SLE and sarcoidosis medically equaled the criteria of Listing 14.02. (Pl.'s Mem. at 13-14.) Plaintiff further contends that the ALJ focused only on Plaintiff's complaints of fatigue and tenderness and neglected to mention potential sarcoidosis-related issues with Plaintiff's pulmonary, nervous and integumentary systems.[4] (Pl.'s Mem. at 13-14.) And Plaintiff argues that the ALJ "summarily dismissed" evidence that Plaintiff experienced malaise. (Pl.'s Mem. at 14.) Defendant responds that substantial evidence supports the ALJ's step-three conclusions. (Def.'s Mot. Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 20) at 14-17.)

At step three, Plaintiff bears the burden of proving that she meets or medically equals a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990.) "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530.

---

[4] The integumentary system refers to the skin and its layers and appendages, including the epidermis, dermis, subcutaneous tissue, hair, nails, cutaneous glands and mammary glands. *Integumentum Commune*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

Plaintiff's condition must satisfy all of the enumerated criteria in Listing 14.02 to qualify her as disabled at step three. *Id.* Specifically, to meet the requirements of Listing 14.02, Plaintiff must provide medical documentation of SLE with either:

A. Involvement of two or more organs/body systems, with: 1. One of the organs/body systems involved to at least a moderate level of severity;[5] and 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). [OR]

B. Repeated manifestations of SLE,[6] with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: 1. Limitation of activities of daily living; 2. Limitation in maintaining social functioning; [or] 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.[7]

20 C.F.R. Part 404, Subpart P, App. 1, 14.02(A)-(B).

---

[5] The regulations define the levels of severity as the medical community would commonly define them. 20 C.F.R. Part 404, Subpart P, App. 1, 14.00.C.12.

[6] "Repeated" means that the manifestations of SLE "occur on an average of three times a year, or once every [four] months, each lasting [two] weeks or more; or the manifestations do not last for [two] weeks but occur substantially more frequently than three times a year or once every [four] months; or they occur less frequently than an average of three times a year or once every [four] months but last substantially longer than [two] weeks." 20 C.F.R. Part 404, Subpart P, App. 1, 14.00.I.3.

[7] The regulations define "marked limitation" to mean that the signs and symptoms of a claimant's immune system disorder "interfere seriously with [the claimant's] ability to function." 20 C.F.R. Part 404, Subpart P, App. 1, 14.00.I.5. The regulations explain that a marked limitation in a claimant's activities of daily living requires "a serious limitation in [the claimant's] ability to maintain a household or take public transportation because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by [the claimant's] immune system disorder . . . or its treatment." *Id.* at 14.00.I.6. A marked limitation in social functioning involves "a serious limitation in social interaction on a sustained basis . . . even if [a claimant is] able to communicate with close friends or relatives." *Id.* at 14.00.I.7. And a marked limitation in completing tasks in a timely manner requires evidence that a claimant has "a serious limitation in [his or her] ability to sustain concentration or pace adequate to complete work-related tasks . . . even if [the claimant is] able to do some routine activities of daily living." *Id.* at 14.00.I.8.

Here, the ALJ found that Plaintiff's physical impairments failed to meet or medically equal the criteria of Listing 14.02. (R. at 22.) The ALJ noted that although Plaintiff had complained of symptoms involving multiple body systems, the objective medical findings appeared minimal, showing only mild tenderness to palpitation in Plaintiff's hands and feet. (R. at 22.) Additionally, the ALJ found that the Plaintiff exhibited only one of the constitutional symptoms or signs, with significant complaints of fatigue but no reports of fever or malaise and only intentional — not involuntary — weight loss. (R. at 22.)

In reaching her step-three conclusions, the ALJ considered the opinion of medical expert Maria Rivero, M.D., who opined that Plaintiff's impairments did not meet or medically equal the criteria of Listing 14.02. (R. at 23.) The ALJ noted that Dr. Rivero had cited to objective findings throughout the medical record to support her conclusions and consequently afforded Dr. Rivero's opinion concerning Listing 14.02 great weight. (R. at 23.)

Ultimately, with neither Paragraph A nor Paragraph B of Listing 14.02 satisfied, the ALJ concluded that Plaintiff's impairments — both singly and in combination — did not meet or medically equal the criteria of the Listing. (R. at 22.) Substantial evidence supports the ALJ's conclusion.

### 1. Plaintiff's Objective Medical Records Support the ALJ's Listing 14.02 Findings.

A review of the entire medical record provides substantial evidence to support the ALJ's findings regarding Listing 14.02. First, Plaintiff's records support the ALJ's finding that the objective medical record provided minimal evidence of multisystemic effects. (R. at 22.) Indeed, although Plaintiff cites to records from May and August 2016 indicating possible sarcoidosis/SLE involvement with her nervous system, (Pl.'s Mem. at 13 (citing R. at 747, 776)), the May 2016 record noted that her neurological exam appeared "ok" and questioned Plaintiff's

complaints of seizures, (R. at 747), and the August 2016 record reflected that Plaintiff's palsies and neuropathy could be a manifestation of her rheumatological disease, (R. at 776). Moreover, medical studies performed after August 2016 showed no abnormalities in Plaintiff's nervous system. (R. at 739 (noting results from October 2016 electroencephalogram ("EEG") showing no seizure activity and September 2016 magnetic resonance imaging ("MRI") of the brain showing no abnormalities), 767 (noting "no clear evidence" of sarcoidosis and SLE impacting Plaintiff's nervous system and no convulsions witnessed by others).)

As for Plaintiff's assertion that her sarcoidosis and SLE affected her pulmonary system, the objective medical evidence likewise supported the ALJ's implicit conclusion that Plaintiff's sarcoidosis/SLE had no pulmonary implications. Although Plaintiff cites to appointments in January and April 2015 suggesting pulmonary sarcoidosis, (Pl.'s Mem. at 13 (citing R. at 675, 792, 802)), such suggestions proved far from confirmed, as Plaintiff's physicians hypothesized that Plaintiff's shortness of breath may have stemmed from causes other than sarcoidosis/SLE, (R. at 802 (hypothesizing that Plaintiff's shortness of breath "may be cardiac related" or caused by "infection" as well as potential sarcoidosis or SLE); *see also* R. at 675 (concluding in April 2015 that Plaintiff had been diagnosed with pulmonary sarcoidosis without any support from the medical records), 792 (same in January 2015)). Notably, Plaintiff's treatment records following the January 2015 speculations of possible pulmonary sarcoidosis continued to show normal pulmonary functioning. (R. at 656 (recording no wheezing, coughing or shortness of breath in April 2015), 660 (same in May 2015), 675 (same in April 2015), 679 (recording no wheezes, rales or rhonchi in August 2015), 681 (recording no wheezing, coughing or shortness of breath in July 2015), 683 (recording no wheezes, rales or rhonchi in June 2015), 685 (recording no wheezing, coughing or shortness of breath in May 2015), 689 (same in March 2015), 691 (same

in February 2015), 701 (same in February 2017), 702 (same in December 2016), 704 (same in

November 2016), 706 (same in October 2016), 707 (same in September 2016), 708 (same in

August 2016), 709 (same in July 2016), 710 (same in June 2016), 711 (recording no rales,

rhonchi or wheezes in May 2016), 712 (same in April 2016), 714 (same in February 2016), 715

(same in January 2016), 716 (recording no wheezing, coughing or shortness of breath in

December 2015), 717 (same in November 2015), 719 (same in September 2015), 720 (same in

August 2015), 722 (recording dry cough but noting negative chest x-rays other than prominent

hilar region in February 2017).) And later examinations of Plaintiff's chest and lungs showed no

sarcoidosis in her pulmonary system. (R. at 742-43 (noting clear lungs on December 2016 chest

x-ray despite crackles, shortness of breath and chest pain).)

Neither do the medical records support Plaintiff's contention that her SLE and sarcoidosis

affected her integumentary system. Although Plaintiff cites to appointments suggesting that

Plaintiff's SLE/sarcoidosis "likely" involved Plaintiff's skin, (Pl.'s Mem. at 13 (citing to R. at

674-75, 723, 737)), the April 2015 appointment to which Plaintiff cites stated only that her skin

rash "may or may not be lupus related" and found no need to "upgrade [Plaintiff's] lupus

treatment," (R. at 675). Moreover, the final assessment from the same April 2015 appointment

recorded that Plaintiff's skin rash appeared "more consistent with rosacea" and that her

sarcoidosis and SLE both "appear[ed] to be doing well." (R. at 676.) Likewise, the February

2017 appointment to which Plaintiff cites stated only that Plaintiff's SLE constituted the

"possible" cause of her skin conditions and noted no sarcoidotic involvement with Plaintiff's

integumentary system. (R. at 723.) And appointment records between the April 2015 and

February 2017 appointments on which Plaintiff relies recorded generally normal skin with no

rashes, masses or lesions. (R. at 656 (recording no skin rash, boils or persistent itch in April

2015), 679 (recording no lesions or masses on Plaintiff's head, neck and abdomen in August 2015), 681 (recording no lesions or masses on Plaintiff's neck and abdomen in July 2015), 683 (recording normal skin with no rashes or lesions in June 2015), 685 (noting no lesions or masses on Plaintiff's head and neck in May 2015), 701 (recording no nodules or masses on Plaintiff's neck and abdomen in February 2017), 702 (same in December 2016), 704 (same in November 2016), 706 (same in October 2016), 707 (same in September 2016), 708 (same in August 2016), 709 (same in July 2016), 710 (same in June 2016), 711 (same in May 2016), 712 (same in April 2016), 714 (noting that abdomen had healed in February 2016), 715 (recording redness of the skin around the abdomen in January 2016), 716 (recording no masses on neck or abdomen in December 2015), 717 (same in November 2015), 719 (recording no lesions or masses on head, throat, neck and abdomen in September 2015), 720 (same in August 2015), 735-38 (recording warm and dry skin with no rashes, but describing a nasal ulcer and small papules on the nose resembling clogged follicles in December 2016), 746 (recording some redness and discoloration of the skin around Plaintiff's neck in May 2016), 751-52 (recording no oral ulcers/lesions and no purpura or rashes in January 2016), 753 (noting "[n]o evidence of clinically-significant lupus activity" and no rash in January 2016). *But see* R. at 763 (noting hair loss and ongoing rash in October 2015).)

Undoubtedly, the evidence of record provided substantial support for the ALJ's conclusion that Plaintiff's SLE had no multisystemic effects, and Plaintiff's assertions regarding possible multisystemic sarcoidosis involvement fail to rescue her challenge. As the ALJ aptly noted, Plaintiff's medical records contained minimal objective findings of any multisystemic involvement, regardless of the disorder chosen. (R. at 22.) Importantly, nothing in the medical

record suggested that Plaintiff's organs or body systems were "involved to at least a moderate level of severity" as required by Listing 14.02. 20 C.F.R. Part 404, Subpart P, App. 1, 14.02(A).

Moreover, regardless of the number of organs/body systems affected by Plaintiff's sarcoidosis or SLE, the objective medical evidence also failed to show that Plaintiff experienced at least two constitutional symptoms or signs — namely, severe fatigue, fever, malaise or involuntary weight loss — a requirement of both Paragraphs A and B under Listing 14.02. Part 404, Subpart P, App. 1, 14.02(A)-(B). Although the ALJ found evidence of fatigue, she found no reports of fever or malaise and evidence of only intentional weight loss. (R. at 22.) Indeed, during nearly every appointment referencing fever, Plaintiff either denied, or physicians marked her negative for, signs of fever. (R. at 313, 316, 318, 326, 335, 338, 341, 344, 347, 350, 353, 356, 359, 364, 376, 379, 381, 467, 469, 491, 518, 552, 656, 660, 701-02, 706-09, 714. *But see* R. at 320, 634, 753.)[8] And, although Plaintiff contends that the ALJ "summarily dismissed" evidence of malaise, the evidence of record in fact supports the ALJ's conclusion that Plaintiff did not experience malaise as defined by the Listings.[9] For example, Plaintiff appeared alert, oriented and in no apparent or acute distress throughout her treatment. (R. at 315, 317-18, 321, 324, 327, 333, 336, 339, 342, 345, 348, 351, 357, 360, 365, 425, 439, 455, 467, 469, 476, 479, 480, 492, 507, 519-20, 603, 623-24, 656, 660, 675, 679, 683, 685, 689, 693, 701-02, 706-09,

---

[8]    Although the record contains three appointments during which Plaintiff's physicians recorded evidence of fever, the three appointments noting fever described it as "low grade" or attributed it to something other than Plaintiff's immunological disorders. (R. at 320 (recording "low grade" fever in June 2014), 634 (noting fever due to chicken pox in January 2015), 753 (noting fever due to "lupus flare after panniculectomy," or a surgery to remove excess skin and fat from the abdomen).) In any case, though technically the record contained three reports of fever, the ALJ's overall conclusion that Plaintiff exhibited minimal to no fever-like symptoms finds substantial support in the record.

[9]    The Listings define "malaise" to mean "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. Part 404, Subpart P, App. 1, 14.00.C.2.

714, 717, 719-20, 735, 738, 746, 752, 757, 767, 772, 783, 795. *But see* R. at 363 ("tired-appearing" in October 2011), 553 ("moderate distress" in May 2014).) Plaintiff also exhibited consistently normal memory and psychomotor functioning, suggesting that any malaise had no significant effects on her mental functioning as required by Listing 14.02. Part 404, Subpart P, App. 1, 14.00.C.2; (R. at 333, 342, 345, 360, 363, 382, 479, 520, 701-02, 706-09, 772.) Likewise, Plaintiff reported that she could exercise for up to an hour per day — though sometimes in segments — and exhibited little to no change in her strength or exercise tolerance, suggesting that any malaise had not "significantly reduced [her] physical activity" as required under Listing 14.02. 20 C.F.R. Part 404, Subpart P, App. 1, 14.00.C.2; (R. at 476, 623, 685, 689, 691, 710-12, 716-17, 719-20, 723, 747, 767, 773, 793. *But see* R. at 761 (reporting that she could perform only five minutes of stationary bike exercise before getting tired in October 2015).) And Plaintiff complained infrequently of — and even denied — feeling ill or in discomfort. (*Compare* R. at 332 (recording that Plaintiff "[was] doing well" in March 2014), 335 (denying fatigue or fever in August 2013), 344 (recording that Plaintiff "[was] doing well" in March 2013), 378 ("doing well" in October 2014), 467 (denying shakes or chills, though complaining of "some" joint stiffness in November 2014), 469 (same in July 2014), 478 ("feeling better" in December 2014), 479 ("generally healthy" in December 2014), 491 (no vomiting or nausea in September 2014), 507 (denying fevers, shakes and chills in July 2014), 518 (denying nausea, vomiting, dizziness and headache in June 2014), 552 (same in May 2014), 656 (no tremors, numbness, dizziness, vomiting or nausea in April 2015), 660 (same in March 2015), 679 (feeling well in August 2015), 681 (same in July 2015), 685 (complaining of cough due to virus going around her family but otherwise appearing "generally healthy" in May 2015), 689 ("do[ing] well" with no syncope, vertigo or change in strength in March 2015), 691

14

("generally healthy" in February 2015), 701 (reporting that she "felt well" and denying fever, chills, lethargy or fatigue in February 2017), 702 (same in December 2016), 706 (same in October 2016), 707 (same in September 2016), 708 (same in August 2016), 709 (same in July 2016), 710 ("generally healthy" in June 2016), 711 (same in May 2016), 712 (same in April 2016), 714 (no "generalized complaints of fever/chills or any other kinds of malaise" in February 2016), 716 ("generally healthy" in December 2015), 717 (same in November 2015), 719 (same in September 2015), 720 (same in August 2015), *with* R. at 364 (complaining of acute discomfort in August 2011), 634 (feeling "very uncoordinated" in January 2015), 736 (complaining of chest discomfort in December 2016), 763 (complaining of "widespread pain" in October 2015.) Moreover, the record supports the ALJ's finding that Plaintiff underwent only intentional weight loss. (R. at 476, 491, 679, 681, 683, 693, 744, 751, 761, 793.)

Ultimately, a review of Plaintiff's medical records provides substantial support for the ALJ's conclusion that Plaintiff did not suffer from impairments that met or medically equaled the criteria of Listing 14.02. Although Plaintiff characterizes the ALJ's assessment of her records as conclusory, the Court finds the ALJ's explanation more than adequate given the overwhelming weight of the evidence.

### 2. *Dr. Rivero's Opinion Further Supports the ALJ's Listing 14.02 Findings.*

In reaching her step-three conclusions, the ALJ also considered the opinion of Dr. Rivero, a medical expert whose opinion the ALJ solicited in May 2017. (R. at 23, 824.) Indeed, the regulations permit ALJs to "consider opinions from medical sources on issues such as whether [a claimant's] impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments," though "the final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). ALJs may also solicit "medical

evidence from expert medical sources," such as Dr. Rivero.  §§ 404.1513a(b)(2), 416.913a(b)(2); *see also* §§ 404.1527(e), 416.913(e) (applying §§ 404.1513a and 416.913a to applications filed before March 27, 2017, except when an ALJ gives controlling weight to a treating source's medical opinion).

On May 21, 2017, Dr. Rivero issued her opinion as to whether Plaintiff satisfied any of the listings. (R. at 833-36.) Based on her review of Plaintiff's medical records, Dr. Rivero found that Plaintiff suffered from obesity, sarcoidosis and SLE. (R. at 833.) When asked if any of these impairments, either singly or in combination, met or medically equaled any of the listings, Dr. Rivero responded that Plaintiff's impairments satisfied none of the listed impairments. (R. at 833.) Relevant here, Dr. Rivero opined that Plaintiff's impairments failed to satisfy Listing 14.02, in part, because although Plaintiff suffered from arthralgias (joint pain), her condition improved after treatment, with negative x-rays. (R. at 833.) Dr. Rivero also noted that many of Plaintiff's complaints, including blurry vision and chest pain, failed to align with the objective medical findings. (R. at 833.) And Dr. Rivero cited to contradictions between the records contained in Exhibit 14F, in which Plaintiff complained of fatigue and being unable to open medicine bottles, and those contained in Exhibit 13F, in which Plaintiff reported feeling well and underwent x-rays revealing no abnormalities in her hands and wrists. (R. at 833.) Dr. Rivero also noted that Plaintiff reported exercising thirty minutes per day. (R. at 833.) As to Plaintiff's sarcoidosis, Dr. Rivero cited to Plaintiff's near-normal pulmonary function tests ("PFT") results and a computed tomography ("CT") scan of Plaintiff's chest showing decreased nodule size. (R. at 833.)

The ALJ afforded Dr. Rivero's opinion regarding Listing 14.02 great weight, explaining that she had cited thoroughly to the evidence of record to support her conclusions. (R. at 23.)

Indeed, as Dr. Rivero correctly observed, although Plaintiff complained of joint pain during some appointments, (R. at 723, 744, 761, 833), her joints improved after treatment, with normal x-ray results, (R. at 751 (noting "improving joint pain" in January 2016), 784 (noting no signs of knee or ankle swelling in February 2015), 787-91 (February 2015 x-ray showing no acute fracture, normal joint space alignment, no joint space erosion, no focal soft tissue abnormality and no signs of inflammatory arthropathy in both of Plaintiff's hands and wrists)). The medical records also agreed with Dr. Rivero's observation that Plaintiff's cardiac testing proved normal despite her complaints of chest pain. (R. at 729-30 (showing normal echocardiogram results in January 2017), 746 (recording normal cardiac MRI results with no evidence of cardiac sarcoidosis in May 2016), 751 (noting no chest pain in January 2016), 755 (recording normal EKG, echocardiogram, PFTs and cardiac MRI results despite Plaintiff's complaints of chest pain in April 2015), 761 (complaining of continued chest pain despite normal myocardial perfusion stress test[10] in October 2015), 833.) Likewise, the records supported Dr. Rivero's finding that Plaintiff failed to follow up with her complaints of blurry vision and otherwise exhibited normal eye functioning. (R. at 744 (complaining of blurry vision in May 2016), 751 (same in January 2016), 755 (same in April 2015), 761 (same in October 2015), 772 (denying vision changes and showing normal pupils in August 2016), 782 (complaining of blurry vision in February 2015), 783 (noting upcoming March 2015 eye exam of which there is no record), 801 (denying blurry vision in January 2015), 833.) Significantly, as Dr. Rivero aptly noted, Plaintiff's medical records revealed internal and external inconsistencies between Plaintiff's complaints of fatigue

---

[10]    A myocardial perfusion stress test, also called a nuclear stress test, uses a radioactive tracer to "show how well blood flows through the heart muscle" and may sometimes be combined with a treadmill exercise. Myocardial Perfusion Scan, Stress, John Hopkins Medicine (Apr. 3, 2019, 1:39 PM), https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/myocardial-perfusion-scan-stress.

and hand/wrist pain and her reports of feeling well and being able to exercise for at least thirty minutes, as well as x-rays showing normal hands and wrists. (*Compare* R. at 723 (complaining of severe fatigue and being unable to open medicine bottles but reporting that she exercised thirty minutes per day in February 2017), 737 (complaining of fatigue in December 2016), 739 (noting no evidence of arthropathy on February 2015 x-ray of hands), 755-56 (complaining that she could not open bottles but noting no stiffness or pain in her joints in April 2015), *with* 701 (reporting that she "felt well" and denying fever, chills, lethargy or fatigue in February 2017), 702 (same in December 2016), 706-09 (same in July 2016, August 2016, September 2016 and October 2016), 710 ("generally healthy" in June 2016), 711 (same in May 2016), 712 (same in April 2016), 714 (no "generalized complaints of fever/chills or any other kinds of malaise" in February 2016), 716 ("generally healthy" in December 2015), 717 (same in November 2015), 719 (same in September 2015), 720 (same in August 2015), 751 (noting "[i]mproving joint pain" in January 2016), 787-91 (February 2015 x-ray showing no acute fracture, normal joint space alignment, no joint space erosion, no focal soft tissue abnormality and no signs of inflammatory arthropathy in both of Plaintiff's hands and wrists).) Plaintiff also had normal PFT results, and a CT scan of her chest revealed improving lymph nodes, which Dr. Rivero correctly noted. (R. at 739 (recording normal PFT results and improving lymph nodes on chest CT scan), 743 (showing normal heart size, clear lungs and "[n]o acute process" despite prominence of hilar lymph nodes), 755 (referencing improving mediastinal lymph node but new apical node on 2015 CT chest scan), 761 (referencing normal PFT scores and improved lymph nodes on 2015 CT scan), 833.)

Given the overwhelming consistencies between the objective medical evidence and Dr. Rivero's opinion regarding Listing 14.02, the Court finds that substantial evidence supports the

ALJ's decision to afford Dr. Rivero's opinion concerning Listing 14.02 great weight. Accordingly, Dr. Rivero's opinion that Plaintiff's impairments, either singly or in combination, did not meet or medically equal the criteria of Listing 14.02 provided further support for the ALJ's step-three conclusions. Finding no insufficiency in the ALJ's explanation regarding Listing 14.02, and because substantial evidence supports the ALJ's finding that Plaintiff did not meet the criteria of that Listing, the Court finds no grounds for remand.

### B.     The ALJ Erred in Her Analysis of Plaintiff's Subjective Complaints.

Plaintiff argues that the ALJ erred in finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms proved inconsistent with the medical evidence and other evidence of record. (Pl.'s Mem. at 14-18.)  Specifically, Plaintiff contends that the ALJ improperly discredited her complaints of pain by relying on her testimony about taking only over-the-counter, non-steroidal anti-inflammatory drug ("NSAID") pain relievers without considering her reasons for refusing more effective prescription medications. (Pl.'s Mem. at 15-17.)  Plaintiff further contends that the ALJ could not rely on her adherence to an exercise regimen to discredit her complaints of fatigue, because her ability to exercise up to thirty minutes per day to improve her overall health cannot support a finding that she could work on a sustained and competitive basis. (Pl.'s Mem. at 17-18.)  Defendant responds that substantial evidence supports the ALJ's findings. (Def. Mem. at 18-20.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's consistent complaints. As of March 28, 2016, the ALJ must follow a revised two-step

analysis in reviewing a claimant's subjective complaints. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); *see also* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) (correcting terminology relating to applicable date); SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016) (correcting effective date to March 28, 2016). The first step requires the ALJ to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 16-3p, 2016 WL 1119029, at *3. If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's "symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work related activities." *Id.* at *4. The ALJ's step-two evaluation must first consider the consistency between a claimant's statements and the objective medical evidence. *Id.* at *5. Unless the ALJ can determine that a claimant qualifies as disabled based solely on objective medical evidence, the ALJ must also consider other sources of evidence to determine consistency, including "statements from the [claimant], medical sources, and any other sources that might have information about the [claimant's] symptoms." *Id.* at *5. Based on the degree of consistency between a claimant's statements and the evidence of record, the ALJ should find either a higher or lower likelihood that the claimant can perform work-related activities. *Id.* at *8.

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994) (internal citations omitted). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the

existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." (R. at 24.)

As to Plaintiff's symptoms of SLE and sarcoidosis — including shortness of breath, chest pain, muscle pain, diminished exercise tolerance, leg pain and occasional difficulty swallowing — the ALJ noted that Plaintiff's symptoms improved with treatment, specifically citing to reports that Plaintiff no longer had to stop and catch her breath. (R. at 24-25.) The ALJ further noted that Plaintiff took only NSAID medications to relieve pain, refusing prescribed drugs. (R. at 25.) And the ALJ explained that although Plaintiff testified to taking naps during the day, she could also carry out daily activities such as meal preparation, driving and climbing stairs at least twice per day. (R. at 25.)

Referencing Plaintiff's complaints of joint pain and fatigue, the ALJ observed that Plaintiff could write in her journal for several hours despite complaints of hand pain. (R. at 25.) The ALJ also found that Plaintiff's joint pain and fatigue had only a mild to moderate effect on her exertional, postural and manipulative abilities. (R. at 25.) The ALJ conceded that Plaintiff's most recent medical records showed "ongoing tenderness in her right hand and feet with continued complaints of fatigue" but explained that Plaintiff nonetheless exercised at least thirty minutes per day using an exercise bike, tension band and balance board, suggesting that Plaintiff could "engage in at least sedentary work." (R. at 25.)

As for Plaintiff's complaints of depression, the ALJ observed that Plaintiff responded well to medicative treatment implemented in December 2014 and thereafter continued to feel better, rarely reporting that she felt depressed. (R. at 25.) And, although Plaintiff reported trouble concentrating, the ALJ again cited to evidence that Plaintiff responded positively to medication. (R. at 25.)

The Court finds that the ALJ's explanation proves legally inadequate. As Plaintiff correctly points out, Social Security Ruling ("SSR") 16-3p, which became effective before the ALJ issued her opinion, provides that the Commissioner "will not find an individual's symptoms inconsistent with the evidence in the record [because the individual fails to follow prescribed treatment that might improve symptoms] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."[11] SSR 16-3p, 2016 WL 1119029, at *8. SSR 16-3p further provides that the Commissioner "will explain how [she] considered the [claimant's] reasons in [her] evaluation of the [claimant's] symptoms." *Id.* at *9. And SSR 16-3p advises the Commissioner to consider whether a claimant's prescription medications caused side effects that proved "less tolerable than the [claimant's] symptoms." *Id.*

Here, during her hearing, Plaintiff explained that she refused to take certain pain medications, stating that she "[would] not take them." (R. at 48-49.) When the ALJ asked what

---

[11]      Social Security Rulings are "final opinions and orders and statements of policy and interpretations" adopted by the Social Security Administration. 20 C.F.R. § 402.35(b)(1). "While [SSRs] do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995). Once published, these rulings bind ALJs. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); § 402.35(b)(1). SSR 96-7p, which SSR 16-3p superseded, also required ALJs to consider a claimant's explanation for not following prescribed treatment. SSR 96-7p, 1996 WL 374186, at *7-8.

she took to treat her pain, Plaintiff explained that she took ibuprofen and Excedrin, both over-the-counter, NSAID medications. (R. at 49.) Later, Plaintiff testified that her new sarcoidosis physician wanted to try transfusions in lieu of steroids due to Plaintiff's difficulty with steroid medications. (R. at 54.) And when Plaintiff's attorney-representative asked Plaintiff to clarify why she did not take her prescribed pain relievers, Plaintiff explained that she felt "like a zombie" when she took them and did not want "to become addicted to them." (R. at 57.) Plaintiff added that steroids caused her to have an allergic reaction. (R. at 57.)

The objective medical evidence also indicated several possible reasons why Plaintiff refused more effective pain relievers. During an October 2014 appointment at Virginia Commonwealth University's Rheumatology Clinic, for example, Plaintiff's physician, Dr. Zahirovic, noted that Plaintiff refused to take the steroid prednisone, because the drug caused her to experience homicidal ideations. (R. at 426; *see also* R. at 723 (describing hallucinations from prednisone), 737 (same).) Dr. Zahirovic added that the clinic no longer recommended prednisone for Plaintiff due to its side effects. (R. at 426.) Instead, Dr. Zahirovic recommended meloxicam, a NSAID pain reliever. (R. at 426. *But see* R. at 756 (recording that Plaintiff no longer took meloxicam as prescribed).) Plaintiff's records also reveal that she suffered from an allergy to Percocet. (R. at 438.) And Plaintiff's appointment records described her troubles with opioid addiction, which she provided as a reason for not taking more potent pain relievers. (R. at 57, 704, 710, 719.)

Despite the reasons provided by Plaintiff for refusing her prescribed pain relievers and evidence in the record to support those reasons, the ALJ failed to explain why Plaintiff's failure to follow prescribed pain treatment nonetheless undermined her subjective complaints of pain, stating only that "[Plaintiff] has refused [prescription] pain medication." (R. at 25.) Such an

explanation runs afoul of SSR 16-3p and deprives this Court of its ability to determine whether substantial evidence supports the ALJ's implicit finding that Plaintiff's reasons for noncompliance lacked credibility. *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("The record should include a discussion of which evidence the ALJ found credible and why . . . If the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course . . . is to remand to the agency for additional investigation and explanation.'" (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)) (additional citations omitted)). Thus, the Court must remand for further consideration of this issue.

As for the ALJ's reliance on Plaintiff's ability to exercise to conclude that her fatigue and joint pain had only mild to moderate effects on her exertional, postural and manipulative abilities such that she could perform at least sedentary work, the Court likewise finds the ALJ's explanation inadequate. (R. at 25.) Although Plaintiff's continued ability to exercise may constitute one of many factors showing that a claimant's pain or fatigue proves less severe than the claimant endorsed, here, the ALJ presented Plaintiff's ability to follow an exercise regimen as one of only two activities — along with writing in her journal for several hours — that suggested her pain and fatigue did not prevent her from engaging in at least sedentary work. (R. at 25.) Plaintiff's ability to exercise at least thirty minutes per day, though probative, fails, on its own, to bridge the logical gap necessary to establish that Plaintiff's pain and fatigue did not result in greater functional limitations. *See, e.g., Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2006) ("The mere fact that a plaintiff has carried on certain daily activities, such as . . . exercise, does not in any way detract from [her] credibility as to [her] overall disability. One does not need to be utterly incapacitated in order to be disabled." (internal quotations omitted)); *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) ("[T]he ALJ may not rely on

minimal daily activities as substantial evidence that a claimant [did] not suffer disabling pain."
(citing *Frey v. Bowen*, 816 F.2d 508, 516-17 (10th Cir. 1987)). Such a logical shortfall proves
particularly defective when, as here, Plaintiff's treating physician prescribed exercise to treat her
pain. (R. at 763 (recommending combined aerobic and strengthening exercises to treat
Plaintiff's diffuse pain).) The ALJ cannot fault Plaintiff for noncompliance with prescribed
treatment and then fault her for compliance a few sentences later without providing an
explanation for the inconsistency. Without more explanation, the Court must remand.

### C. The ALJ Failed to Adequately Explain the Weight Afforded to the Medical Opinions of Record, Preventing Meaningful Review.

Plaintiff argues that the ALJ failed to adequately assess the weight afforded to the
opinions of her treating physician, Dr. Zahirovic, and the state agency medical and psychological
consultants. (Pl.'s Mem. at 19-22.) Specifically, Plaintiff contends that the ALJ failed to
properly explain why she afforded Dr. Zahirovic's opinion little weight and that substantial
evidence does not support the weight assigned. (Pl.'s Mem. at 20-21.) Plaintiff further contends
that the ALJ improperly afforded little weight to the opinion of the state agency psychological
consultant on initial review, because the consultant's findings proved consistent with Dr.
Zahirovic's opinion and the evidence of record. (Pl.'s Mem. at 22.) Defendant responds that the
ALJ properly explained, and the evidence of record adequately supported, the weight assigned to
the medical opinions. (Def.'s Mem. at 20-22.)

During the sequential analysis, when the ALJ determines whether the claimant has a
medically determinable severe impairment, or combination of impairments which would
significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ
must analyze the claimant's medical records that are provided and any medical evidence
resulting from consultative examinations or medical expert evaluation that have been ordered.

20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains a number of different medical opinions, including those from the claimant's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. §§ 404.1527(c), 416.927(c). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(1)-(6), (d), 416.927(c)(1)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[12] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. SSR 06-03p; §§ 404.1527(f), 416.927(f).[13] Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.

---

[12]     Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claims on September 14, 2014, before this regulation took effect. (R. at 225-32.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim(s).

[13]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f). The given examples are a non-exhaustive list. SSR 06-03p.

§§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F. 3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

When considering a treating source's opinion, the ALJ must evaluate those findings just as any other medical opinion. §§ 404.1527(c), 416.927(c). The ALJ "will always give good reasons . . . for the weight . . . give[n to a] treating source's medical opinion." §§ 404.1527(c)(2), 416.927(c)(2). Determining the specific weight of medical opinions is especially important, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, §§ 404.1527(c)(1), 416.927(c)(1) ("Generally, [the Commissioner] give[s] more weight to the medical opinion of a source who has examined [plaintiff] than to the medical opinion of a medical source who has not examined [plaintiff].")

Treating source opinions are not the only opinions that an ALJ must consider. State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. §§ 404.1513a(b)(1), 416.913a(b)(1).

Requiring an ALJ to assign specific weight to medical opinions is necessary, because a reviewing court "faces a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). Unless the Commissioner "has sufficiently

explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted). The assignment of weight needs to be sufficiently specific "to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for that weight." SSR 96-2p (discussing affording weight to treating physician). Accordingly, a reviewing court cannot determine if substantial evidence supports an ALJ's findings "unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259)).

Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must consider the factors set forth in §§ 404.1527(c)(1)-(6) and 416.927(c)(1)-(6) when deciding the weight to give any medical opinion. This includes: (1) whether the source of the opinion has examined the Plaintiff; (2) whether the source of the opinion has a relationship with the plaintiff, and the nature, extent, and length of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; 5) whether the source of the opinion is a specialist; and, (6) any other factors that support or contradict the opinion (including "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has"). 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

## 1. The ALJ Provided an Adequate Explanation for Affording Little Weight to Dr. Zahirovic's Opinion and Substantial Evidence Supports the Weight Assigned.

Dr. Zahirovic started treating Plaintiff for rheumatological issues in August 2014. (R. at 474.) On January 20, 2015, Dr. Zahirovic completed a Residual Functional Capacity Questionnaire for Plaintiff. (R. at 472-74.) On the Questionnaire, Dr. Zahirovic listed diagnoses of SLE and sarcoidosis, describing the prognosis for these conditions as "very good w[ith] treatment." (R. at 472.) Dr. Zahirovic identified symptoms of photosensitivity, hair loss, Raynaud's Syndrome,[14] joint pain, orthopnea and mucosal ulcers, opining that Plaintiff's symptoms often expressed themselves severely enough to interfere with her ability to pay attention and concentrate such that she could not complete simple, work-related tasks. (R. at 472.) Dr. Zahirovic further noted that Plaintiff's medications caused her to experience blurred vision, upset stomach and nausea. (R. at 472.) When asked whether, during an average workday, Plaintiff would need to rest more frequently than a fifteen-minute break in the morning and afternoon and a thirty-to-sixty-minute break for lunch, Dr. Zahirovic marked "Yes." (R. at 472.)

Functionally, Dr. Zahirovic estimated that Plaintiff could walk half of a city block and sit for up to sixty minutes and stand for up to thirty minutes at one time. (R. at 472.) In Dr. Zahirovic's estimation, Plaintiff could also sit for no more than two hours and stand for no more than thirty minutes in an eight-hour workday. (R. at 472.) And Dr. Zahirovic noted that Plaintiff would require a sit-stand option and at least fifteen unscheduled breaks throughout the workday, each lasting fifteen to twenty minutes. (R. at 472.) Exertionally, Dr. Zahirovic opined that

---

[14]     Raynaud's Syndrome, or acrocyanosis, describes "persistent, uneven blue or red discoloration of the skin of the digits, wrists, and ankles accompanied by profuse sweating and coldness of the digits." *Acrocyanosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

Plaintiff could never lift or carry any amount of weight. (R. at 473.) Dr. Zahirovic also limited Plaintiff's ability to grasp, turn, twist, manipulate and reach to only 12 percent of the time during an average workday. (R. at 473.) Dr. Zahirovic estimated that Plaintiff would miss work more than four times per month due to her impairments or treatments. (R. at 473.) And Dr. Zahirovic denied that Plaintiff qualified as a "malingerer." (R. at 473.) Ultimately, Dr. Zahirovic concluded that Plaintiff proved incapable of working eight hours per day, five days per week on a sustained basis. (R. at 473.)

The ALJ afforded Dr. Zahirovic's opinion little weight, explaining that "[w]hile Dr. Zahirovic is a treating source, the treating relationship was fairly new at the time the opinion was provided, and the opinion is not in any way supported by the clinically acceptable evidence of record." (R. at 25.) The ALJ also pointed to inconsistencies between Dr. Zahirovic's prognosis of "very good with treatment" and his very restrictive limitations. (R. at 25; 472-74.) The Court finds this explanation adequate, because although a finding of general inconsistency or consistency with the record, without more, typically deprives a reviewing court of the ability to perform a meaningful review, *see, e.g.*, *Bryant v. Colvin*, 2013 WL 3455736, at *7 (E.D.N.C. July 9, 2013) (finding ALJ's explanation that state agency opinion proved "consistent with the medical evidence of record" inadequate (internal quotations and citations omitted)); *Wilson v. Astrue*, 2012 WL 4717873, at *13-14 (E.D. Va. Oct. 1, 2012) (finding ALJ's explanation that state agency opinions "[were] consistent with the record as a whole" inadequate (internal quotations and citations omitted)), the ALJ here also noted internal inconsistencies between Dr. Zahirovic's promising prognosis and his severely limiting restrictions and pointed to Dr. Zahirovic's relatively short treatment relationship with Plaintiff at the time that he issued his opinion, (R. at 25). Indeed, the regulations list the length and extent of a medical source's

relationship with a claimant as factors that an ALJ may consider in deciding the weight to afford to the source's opinion. §§ 404.1527(c)(2), 416.927(c)(2). Thus, the ALJ provided more than a cursory explanation, pointing to specific evidence and regulatory factors to support her findings.

Moreover, although the ALJ noted that Dr. Zahirovic's opinion "is not in any way supported by the clinically acceptable evidence of record," (R. at 25), such a brief summation allows for meaningful review by its absolute terms, especially considering that the summation followed the ALJ's narrative explanation of the evidence of record. *See Ross v. Berryhill*, 2019 WL 289101, at *6 (E.D. Va. Jan. 3, 2019) ("The ALJ need not repeat herself by regurgitating [the evidence of record] each time that she considers an opinion." (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014))), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019). In other words, by using the absolute terms "not in any way supported," the ALJ did not leave the Court to hypothesize about the ALJ's possible justifications for the weight afforded — the justification being the complete absence of support. *See Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("[I]t is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record."); *Humphreys v. Astrue*, 2009 WL 1885636, at *4-5 (E.D. Wash. July 1, 2009) (finding sufficient ALJ's explanation that limitations found in opinion were internally inconsistent and "not in any way supported" by the record (internal citations and quotations omitted)); *see also Lee v. Berryhill*, 2018 WL 1626083, at *5 (C.D. Cal. Mar. 30, 2018) (finding that ALJ properly rejected opinion, in part, because ALJ noted that physician's own notes "did not in any way support" the physician's extreme limitations). And the ALJ pointed to the specific pieces of evidence — the clinically acceptable findings — that provided no support. (R. at 25.) Whether an absolute finding of inconsistency survives substantial

evidence review proves to be a different question, but the explanation itself permits such a review to occur.

Indeed, the Court's own review of the record supports the ALJ's explanation regarding Dr. Zahirovic's opinion. For one, Dr. Zahirovic recorded that he first started treating Plaintiff in August 2014, five months before his January 2015 opinion. (R. at 474.) During that time, Plaintiff had only four appointments with Dr. Zahirovic — a short treatment relationship in any reasonable mind.[15] (R. at 800-04 (January 2015), 807-09 (September 2014), 811-14 (October 2014), 815-18 (August 2014).) And substantial evidence likewise supported the ALJ's finding of internal inconsistency between Dr. Zahirovic's "very good" prognosis "w[ith] treatment" and the extreme limitations that he endorsed. (R. at 25, 472-73.)

As to the external inconsistencies between Dr. Zahirovic's opinion and the evidence of record, the ALJ's statement that Dr. Zahirovic's opinion was "not in any way supported by the clinically acceptable evidence of record," (R. at 25), though falling within the range of an overstatement, agrees with the overwhelming evidence of record. As mentioned, the medical records showed little to no evidence of multisystemic involvement with Plaintiff's SLE and sarcoidosis, contradicting Dr. Zahirovic's conclusion that those disorders — which he listed as Plaintiff's only two diagnoses — resulted in severe limitations. (R. at 472, 676 (reporting that

---

[15]     Notably, courts within the Fourth Circuit have found short treatment relationships based upon relationships of commensurate length to the one at issue here. *See, e.g., Abel v. Comm'r of Soc. Sec.*, 2018 WL 1570173, at *8 (D.S.C. Jan. 22, 2018) (affirming ALJ's finding of short treatment relationship based on evidence that opinion source had seen the plaintiff only four times); *Thomas v. Comm'r of Soc. Sec.*, 2016 WL 3402702, at *1 (D. Md. June 21, 2016) (affirming ALJ's explanation that medical opinion deserved little weight, in part, because opinion source had seen the plaintiff only four times); *Ingram v. Astrue*, 2013 WL 1175444, at *12 (D. Md. Mar. 20, 2013) (finding claimant "was only at the beginning of treatment regimen" based on four total visits); *Lang v. Astrue*, 2013 WL 425064, at *3 n.4 (D. Md. Feb. 1, 2013) (characterizing five-month relationship as "short-term" and "far from substantial").

skin rash appeared "more consistent with rosacea" and SLE/sarcoidosis both "appear[ed] to be doing well"), 739 (noting results from October 2016 EEG showing no seizure activity and September 2016 brain MRI showing no abnormalities), 742-43 (noting clear lungs on December 2016 chest x-ray despite crackles, shortness of breath and chest pain), 767 (noting "no clear evidence" of sarcoidosis and SLE impacting Plaintiff's nervous system and no convulsions witnessed by others).) Plaintiff also consistently appeared alert, oriented and in no apparent or acute distress, (R. at 314, 317-18, 321, 324, 327, 333, 336, 339, 342, 345, 348, 351, 357, 360, 365, 425, 439, 455, 467, 469, 476, 479, 480, 492, 507, 519-20, 603, 623-24, 656, 660, 675, 679, 683, 685, 689, 693, 701-03, 706-09, 714, 717, 719-20, 735, 738, 746, 752, 757, 767, 772, 783, 795), had normal mental functioning, (R. at 333, 342, 345, 360, 363, 382, 520, 701-02, 706-09, 772), and exhibited little to no change in her strength or exercise tolerance, (R. at 710-12, 716-20, 723, 747, 767, 773, 793). And either Plaintiff or her physicians reported that she felt well or appeared healthy throughout her treatment. (R. at 332, 344, 378, 478-79, 656, 660, 679, 681, 685, 691, 701-02, 706-12, 714, 716-17, 719-720.) Together, these clinical findings supported the ALJ's conclusion that Dr. Zahirovic's limitations lacked any support from the objective medical records, and, consequently, the Court finds no error.

## 2. The ALJ Failed to Adequately Explain the Weight Afforded to the State Agency Medical and Psychological Consultants.

Because the ALJ afforded less-than-controlling weight to Dr. Zahirovic's opinion, the regulations required the ALJ to explain the weight afforded to the other opinions of record. §§ 404.1513a, 404.1527(e), 416.913a, 416.927(e). Here, however, the ALJ failed to provide sufficient explanations as to the weight afforded to the state agency medical and psychological consultants, leaving the Court to speculate as to the evidence that supported the weight assigned.

In considering the opinions of the state agency medical consultants on initial review and reconsideration, the ALJ explained only that the opinions proved "generally consistent with the evidence of record." (R. at 25.) Likewise, in considering the opinion of the state agency psychological consultant on initial consideration, the ALJ explained only that the opinion proved "somewhat consistent" with the evidence of record and that "little evidence" supported the consultant's conclusion that Plaintiff would miss work twice per month. (R. at 26.) And the ALJ explained that the opinion of the state agency psychological consultant on reconsideration proved "generally consistent with the evidence of record, but is not provided in vocationally acceptable terms, making the opinion somewhat vague." (R. at 26.)

Each of these explanations precludes meaningful review by leaving the Court to speculate as to which evidence of record the ALJ found consistent or inconsistent with each opinion. *Fox*, 632 F. App'x at 755; *Orpiano v. Berryhill*, 2018 WL 4326858, at *6-7 (E.D. Va. Aug. 24, 2018); *Bryant*, 2013 WL 3455736, at *7; *Wilson*, 2012 WL 4717873, at *13-14. Unlike the explanation provided for Dr. Zahirovic's opinion, the ALJ also failed to point to internal (in)consistencies or regulatory factors (other than vagueness in one opinion) that justified the weight afforded. Without the ability to conduct a substantial evidence review, the Court must remand to the ALJ for further consideration of the state agency opinions.

### D. The Court Cannot Determine Whether Substantial Evidence Supports the RFC and Corresponding Hypothetical Question Posed to the VE.

The Court need not address Plaintiff's final argument regarding the hypothetical questions posed to the VE and relied upon by the ALJ in reaching her step-five conclusions, because the ALJ's insufficient explanations regarding Plaintiff's subjective complaints and the weight assigned to the state agency opinions prevents the Court from determining whether substantial evidence supports the ALJ's RFC findings. A hypothetical posed to a VE proves

34

"relevant or helpful" only when the hypothetical represents all of the claimant's substantiated impairments. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Unless the Court can determine whether substantial evidence supported the ALJ's RFC findings, the Court cannot determine whether the ALJ properly relied on the VE's testimony in reaching her step-five conclusions. Thus, on remand, the ALJ must reconsider Plaintiff's RFC, including her subjective complaints and the medical opinions of record, and pose new hypotheticals to the VE based on those RFC findings.

## V.    CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Plaintiff's Motion for Summary Judgment (ECF No. 13), DENIES Defendant's Motion for Summary Judgment (ECF No. 20) and VACATES and REMANDS the final decision of the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings. An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: June 6, 2019